**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

DENNIS T. SULLIVAN,

    Plaintiff,

v.                                                         Case No. 8:05-cv-00028-T-17-MSS

COLORADO BOXED BEEF CO.,
a Florida corporation,

    Defendant.

_____/

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

      This matter is before the Court on Defendant's Motion for Summary Judgment (Dkt. 16), filed on June 5, 2006, and Plaintiff's response thereto (Dkt. 40), filed on June 28, 2006. For the reasons below, this Court denies the motion. The following facts are accepted as true, based on the record before the Court, for the purpose of resolving the instant motion.

BACKGROUND

      Prior to his employment with Defendant, Colorado Boxed Beef Co. ("CBBC"), Plaintiff Dennis T. Sullivan ("Sullivan") worked as senior vice president at Robert Wholey & Company, a full-line distributor of food products, including seafood. In approximately 1991, Sullivan met George Carter ("Carter"), who, at that time, worked at Atlanta Provision. When CBBC subsequently purchased Atlanta Provision, Carter, on behalf of CBBC, began buying seafood from Robert Wholey & Company through Sullivan.

      Sometime after their initial meeting, Sullivan and Carter decided to go into business together selling bagged frozen fish to retail stores. Because they lacked sufficient financial resources to fund the business on their own, they submitted a proposal to CBBC. In 1997, Sullivan and Carter met with John Saterbo ("Saterbo"), co-owner and an officer of CBBC. Through ensuing meetings and negotiations, CBBC decided to launch the bagged-fish business. To do so, it created a new, unincorporated division called "The Great Fish Company" ("GFC"). CBBC owned one half of GFC, and another company, Golcop Chile, Inc. ("Golcop"), owned the other half.

1

On October 19, 1998, CBBC and Sullivan entered into an employment agreement ("Agreement"), which Saterbo executed on the company's behalf.  CBBC agreed to a one-year contract with Sullivan, which could be renewed annually.  Sullivan was to receive a $125,000.00 base salary and a 17.5% bonus of GFC's gross profit, excluding interest, storage, and freight, when it exceeded $400,000.00.  Shortly after the parties signed the Agreement, Carter became GFC's president.

Sometime between 2000 and 2001, CBBC agreed to pay Sullivan 20% commission on the non-GFC products he could sell.  The parties intended this as a supplement to Sullivan's income during a period when CBBC claimed that GFC was earning little, if any, profit.  They agreed that any commission for non-GFC products was separate, and in addition to, the Agreement's bonus formula.  For the years 2002-2004, Sullivan was paid about $60,000.00 in bonuses and commission.  Although Sullivan claims that he was repeatedly denied access to information on GFC's financial performance, he eventually learned that GFC earned gross profits exceeding $400,000.00 in 2001, 2002, and 2003.  He claims to have voluntarily terminated his employment in February 2004.  In April 2004, he received a letter from CBBC's counsel reminding him that he agreed not to compete with CBBC, its successors, or assignees for a period of one year after the termination of his employment.

According to CBBC, however, Sullivan's employment with CBBC ended on or about July 24, 2001, when CBBC ceased to operate GFC as an unincorporated division.  To keep GFC viable, CBBC and Golcop formed a separate limited liability corporation ("LLC") that would own and operate it.  At that point, CBBC contends that the LLC became Sullivan's employer.  The reason Sullivan continued to receive paychecks from CBBC was because it handled the LLC's payroll.  In return, the LLC paid a management fee and reimbursed CBBC.

CBBC further alleges that Sullivan understood the change in employers and employment terms.  When Sullivan complained via email about his compensation in 2001, he asked Carter to discuss the issue with both Saterbo and Vincente Perez ("Perez").  Perez is one of the LLC's directors and an officer associated with Golcop, not with CBBC.  From this, CBBC concludes that Sullivan unequivocally understood that CBBC was no longer paying his salary.  CBBC also submits that Sullivan was provided a new compensation plan that replaced the Agreement.  Under the new plan, Sullivan was to be paid a 5% bonus of GFC's net profit.  Disagreeing that replacement occurred, Sullivan has filed suit in this Court, alleging breach of contract and

2

seeking unpaid wages (Dkt. 1). CBBC has motioned for summary judgment (Dkt 16).

## STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that could impact the outcome under the relevant law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). No genuine issue to be resolved at trial exists where the record, taken in its entirety, cannot lead a rational trier of fact to find for the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). When determining whether the moving party has met its burden, the court accepts as true the non-movant's evidence and draws all justifiable inferences in the non-movant's favor. Liberty Lobby, 477 U.S. at 255.

Once the moving party has properly supported its motion for summary judgment, the non-moving party must go beyond the pleadings to show that a genuine issue exists for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). It must present evidence sufficient to meet the burden of proof it would have at trial. Id. at 322. The question is not whether the court finds that the evidence clearly favors one side or the other. Hillburn v. Murata Elecs. N. Am. Inc., 181 F.3d 1220, 1225 (11th Cir. 1999). Rather, the question is whether a fair-minded jury could return a verdict for only one side on the evidence presented. Id.

## DISCUSSION

Sullivan alleges two claims against CBBC: breach of contract and unpaid wages.

*Breach of Contract*

Under Florida law, a contract that does not explicitly include an automatic renewal clause may still be renewed by the parties' subsequent acts and performances. Rothman v. Gold Master Corp., 287 So. 2d 735, 736 (Fla. 3d DCA 1974). In Rothman, an employee filed suit against his former employer, alleging breach of an oral agreement. Id. at 736. The oral agreement was for one year, and the parties could renew it. Id. The court held that, where an agreement expires and the parties continue to act as before, they have implicitly assented to a new contract containing the same stipulations as the previous one. Id. Without explicit agreement, the

3

objective test of whether a reasonable person would believe that the contract had continued applies. Id.

When an employee commits to serve for a definite period but continues working afterwards without a new contract, the presumption is that the original contract's terms still apply. Sultan v. Jade Winds Constr. Corp., 277 So. 2d 574, 576 (Fla. 3d DCA 1973). This presumption may be rebutted in two ways. Id. A party may bring forth evidence showing that the contract's terms changed, or, alternatively, prove, by facts and circumstances, that both parties understood that the previous agreement's terms were not to apply to the continued service. Id. (citation omitted).

For the purpose of resolving the pending motion for summary judgment, this Court accepts as true Sullivan's evidence and makes all justifiable inferences in his favor. *See* Liberty Lobby, 477 U.S. at 255. Under the annually renewable Agreement, Sullivan was to be in charge of the newly formed GCF for one year. His specific role was to increase its bagged frozen fish sales to retailers. CBBC agreed to compensate Sullivan with a base salary of $125,000.00 and to provide him a 17.5% bonus of GFC's gross profit, excluding interest, storage, and freight, when it exceeded $400,000.00.

Although the Agreement did not provide for automatic renewal, the parties' actions subsequent to the expiration date suggest that it remained in effect. *Cf.* Sultan, 277 So. 2d at 575-76. During his deposition, Sullivan indicated that no conversation or writing confirmed that the Agreement was renewed. Nevertheless, he continued to work at CBBC, assuming the Agreement's terms, until voluntarily resigning in 2004.

CBBC alleges that Sullivan understood that his employer changed from CBBC to GFC on or about July 24, 2001, when CBBC and Golcop formed an LLC that would own and operate GFC. Although GFC became separate entity, CBBC assumed its payroll responsibilities and would be paid a management fee and reimbursed for those expenses. That Sullivan's W-2 forms continued bearing CBBC's federal and state employer ID numbers as late as 2004, however, presents a genuine issue of material fact as to who his employer was from July 2001 until his voluntary resignation in February 2004.

CBBC also points out that when Sullivan began to complain about his compensation in 2001, he asked Carter to discuss the issue with both Saterbo and Perez. It concludes that Sullivan's inclusion of Perez in the discussion indicates that Sullivan knew that the LLC, not

4

CBBC, governed his continued employment and compensation.

CBBC's argument is unconvincing. Just because Sullivan wanted to include Perez in the discussion does not conclusively establish that he believed CBBC no longer governed his employment and compensation. Since CBBC handled GFC's payroll and was reimbursed for doing so, Sullivan's inclusion of Perez was understandable in context. Ultimately, the emails reveal little, if anything, about Sullivan's subjective understanding of who his employer was.

Moreover, on April 12, 2004, CBBC's counsel sent Sullivan a letter reminding him of his obligations under their non-compete agreement. Upon signing it, Sullivan agreed not to compete with CBBC, its successors, or its assignees for a period of one year after terminating employment with the company. Although the letter in itself does not help determine whether Sullivan's employment with CBBC ended in 2001 or 2004, it suggests, on its face, that CBBC intended to remain his employer to some extent. Even if GFC existed separately, as CBBC contends, whether Sullivan became one of its employees in 2001 remains debatable on the evidence presented. Consequently, this Court finds that a genuine issue of fact exists as to whether CBBC breached the Agreement.

*Unpaid Wages*

Since a genuine issue of material fact exists as to whether CBBC breached the Agreement, whether it owes Sullivan unpaid wages also remains an issue of material fact. According to Sullivan, GFC earned gross profits exceeding $400,000.00 in 2001, 2002, and 2003. If CBBC breached the Agreement, it may be liable for unpaid commission during those years.

CBBC alleges that Sullivan was provided a compensation plan that replaced the Agreement. According to the new plan, Sullivan was to earn a 5% bonus of GFC's net profit. CBBC contends that Sullivan should not have accepted the bonuses not included in the Agreement if he believed that the Agreement was still in effect.

Sullivan's affidavit indicates that he never received notice of a new contract. Even assuming, *arguendo*, that Sullivan was notified, his acceptance of bonuses and commissions not promised by the Agreement does not necessarily mean that the Agreement was no longer in effect. Whether the parties intended the new compensation plan to eradicate the Agreement's bonus formula remains at issue.

5

CONCLUSION

Sullivan has brought forth sufficient evidence to rebut CBBC's position that no genuine issues of material exist and that it is entitled to a judgment as a matter of law. On the evidence presented, he has met his burden of proof on the essential elements of his case, and a reasonable jury could return a verdict in his favor. Accordingly, it is

**ORDERED** that Defendant's Motion for Summary Judgment (Dkt. 16) be **DENIED**. Granting summary judgment at this stage of the litigation is premature.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida on this 7th day of July, 2006.



ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

cc: All Parties and Counsel of Record